## EVANS v. EVANS.

No. 16844—Opinion Filed Sept. 28, 1926.

Rehearing Denied Feb. 1, 1927.

**1. Divorce—Adultery of Wife—Insufficiency of Evidence.**

To entitle the husband to a divorce on the ground of adultery, the evidence must be convincing; and the uncorroborated testimony of an alleged paramour that he has had sexual intercourse with the wife, voluntarily given to aid the husband to secure a divorce and prevent the payment of alimony, should be acted upon with extreme caution; and where the adulterous acts are denied by the wife and his testimony as to the circumstances leading up to the alleged wrongful acts is contradicted by other witnesses, the husband should be denied the divorce.

**2. Same—Right of Deserted Wife to Divorce—Alimony.**

Where such evidence is offered by the husband in support of an allegation of adultery contained in his cross-petition, and the evidence further shows that he had abandoned his wife and their minor child and appropriated to his own use all their property jointly acquired and left them dependent upon others, the wife should be granted a divorce and such alimony as in the judgment of the court is reasonable, having due regard to her condition and necessities and the value of the husband's estate and his ability to pay.

(Syllabus by Ray, C.)

Commissioners' Opinion, Division No. 1.

Error from District Court, Noble County; Claude Duval, Judge.

Action by Ida May Evans against Fred W. Evans for divorce. The defendant was granted divorce on his cross-petition, and plaintiff was awarded alimony. Defendant appealed from that part of the decree awarding alimony, and plaintiff appealed from the divorce decree and filed cross-petition in error. Affirmed in part and reversed in part.

Harry O. Glasser, for plaintiff in error.

Johnston & Paddock and Sawyer & King, for defendant in error.

Opinion by RAY, C. Suit for divorce was commenced June 14, 1923, by Ida May Evans against Fred W. Evans on the grounds of extreme cruelty and abandonment. January 17, 1925, defendant filed answer and cross-petition, alleging abandonment, extreme cruelty, and gross neglect of duty, and praying for a divorce at cost of plaintiff.

On issues joined the case was called for trial March 23, 1925, and after the evidence was all in the court, March 25th, took the case under advisement. April 7, 1925, the defendant filed motion to reopen the case for newly discovered evidence. It was recited in the motion that plaintiff's attorney had received an anonymous letter in which it was stated that one E. L. Lash and other witnesses would be able to testify concerning the conduct of plaintiff, which would be of importance to the defendant's case, and upon investigation at Liberal, Kan., through the law firm of Light & Hindon of that place, it was learned that E. L. Lash would testify to having had sexual relations with plaintiff in 1915 or 1916, and numerous times since; that one C. O. Ray of Liberal, Kan., would testify that he had slept with plaintiff many nights, and that they had sexual intercourse, and as a result thereof, he had contracted a venereal disease. April 20th, over the objections of plaintiff, defendant's motion was sustained, and the case was reopened for further evidence, and the cause was assigned for further hearing on May 22, 1925. On that day, May 22nd, the defendant, by leave of court, over the objections of plaintiff, filed an amendment to his cross-petition, in which it was alleged that in the month of December, 1912, while plaintiff and defendant were living together as husband and wife, plaintiff had committed adultery with E. L. Lash and had committed other such acts with E. L. Lash in Beaver county up to and including the month of January, 1924. It was further alleged that plaintiff was an inmate of a house of prostitution in Houston, Tex., in the month of January, 1924. At that time the plaintiff was denied additional time to plead to the amendment to the cross-petition and was ordered by the court to answer instanter, and the court proceeded to trial on issues joined on the allegations of the amendment to defendant's cross-petition. The charge of unlawful relations with C. C. Ray appears to have been abandoned.

At the close of all the evidence the court denied plaintiff's prayer for a divorce, and granted the defendant a divorce upon the ground that plaintiff was guilty of adultery with one E. L. Lash during the winter of 1915-1916, prior to the separation of plaintiff and defendant, and of a subsequent date of adultery with E. L. Lash in the year 1924. It was further decreed that defendant pay plaintiff $2,500 as an equitable division of the property owned by them at the time of their separation, and that defendant pay plaintiff $5,000 alimony, or "additional consideration for plaintiff's eight or nine years of toil while living with her husband, based upon her present and future necessities and the defendant's ample ability to pay same." From that part of the judgment awarding plaintiff alimony and a division of the property, the defendant has appealed, and the plaintiff has filed her cross-petition in error.

As before stated, the defendant was granted a divorce from the plaintiff upon the single ground that she had committed adultery with one E. L. Lash. This finding of the court was made upon the uncorroborated testimony of the alleged paramour controverted on material points by other witnesses.

At the time of their marriage in 1909 the plaintiff was under 16 years and the defendant 27 years of age. Plaintiff, prior to marriage, lived with her parents on a farm in Beaver county a few miles southeast of Liberal, Kan. In 1909, while plaintiff was on a visit, or staying with some of her relatives in Noble county, she first met the defendant, who was at that time a tenant farmer in Noble county. From the time of their marriage up until about 1917 they lived on different rented farms in Noble county, and by hard work and careful saving accumulated some personal property. They had one child, a girl, who was born in 1912, and it is agreed that she was a sickly child from the time of her birth until her death in the spring of 1919. The condition of her health was of that character that they were required at different times to place her in a hospital for treatment. It is apparent from the evidence that the parties were not congenial. Each complains of the treatment received at the hands of the other.

In 1917 the defendant found in their rural mail box, located three-fourths of a mile from the residence, a letter addressed to plaintiff from J. W. Vardeman, husband of the plaintiff's sister, who was at that time

in the army. He opened the letter and read it. It appeared to be in answer to a letter from plaintiff, and contained language from which defendant concluded that there was some understanding of an evil nature between them. He confronted her with the letter, and there appears to have been quite a scene at that time. He left home at the time, and soon thereafter instituted divorce proceedings in Noble county, but there was a reconciliation, the divorce action was dismissed, and they again resumed their marriage relations.

Plaintiff's explanation of the letter was, that Vardeman, her brother-in-law. had filed on a claim in Colorado prior to enlisting in the army, and that she wrote him, at the suggestion of her husband, to see if they could get his claim in Colorado; that in answer he had stated that they could have the land provided his wife, plaintiff's sister, did not want it; that in response to that letter she had again written him; that she did not know the contents of the letter intercepted by her husband; that he only showed her a part of it. That evidence of plaintiff is to some extent corroborated by her sister, Mrs. Della Ogen, who had later divorced Vardeman and married E. J. Ogen.

In 1918 the defendant had a sale and sold all of his personal property, with the exception of an automobile, for $1.500 or $1,600, apparently with the view of moving to Beaver county, and soon after the sale they went to visit the plaintiff's people in Beaver county, and stayed with them on a farm for several months. While there defendant did odd jobs of work for different farmers in the community.

It appears that after going to Beaver county the defendant deposited his money, between $700 and $800, in a bank at Liberal, Kan., which was a short distance from where they were staying. On the 18th day of October, 1918, the defendant took his personal belongings and automobile, and left the plaintiff and their child with her father and drove to Liberal, Kan., drew all of his money out of the bank, and never returned.

There is but little dispute as to what was said and done at the time of their separation. The plaintiff's testimony is that defendant merely told her that he was going, and that she and their daughter stood in the window and watched him drive away; that he did not request her to go with him. He testified that he told her that it was time for them to go back to Noble county,

and requested her to go with him, but that she told him he could go to hell if he wanted to; that he then left, and they had never at any time had any further correspondence except that he had sent her a check for $25 to be used in buying things for their child. He testified that he left immediately after she told him "to go to hell"; that they were in the kitchen at the time of their conversation. He answered in response to questions of his attorney on direct examination:

"Q. When you went to the bedroom, did you begin to pack your suitcase? A. It was already packed. Q. Had she seen you pack it. or did she know anything about that? A. I did not have many clothes. Q. Did she see you packing your suitcase, or did she know it was packed? A. Yes."

He then testified that he got in the car, took his suitcase, and drove away. From this testimony it is apparent that the suitcase was packed before he told her he was going to leave. Plaintiff denied that she used the language attributed to her and denied that he asked her to go with him. She testified that she had expressed a willingness to go with him when a place was secured; that at her father's house their daughter was properly cared for, furnished wholesome food. good milk, and that she did not consider it to the child's welfare to take her away without definite arrangement for the care of the child.

Evidence shows that sometime in the winter of 1918-1919, plaintiff's mother and other members of the family were taken with the flu, and she was compelled to take the child and stay with her sister, some miles away; that while there the child became dangerously sick, so that she sent, or caused to be sent, several telegrams of her condition to the defendant. To any of these telegrams no response was received. After the child's death the plaintiff caused the undertaker to wire the defendant, and to that telegram he answered, "Can't come."

With the exception of the one $25 check, the defendant admits that he contributed nothing to the support of his wife or their child, or for their benefit. since he left them at plaintiff's father's place in October, 1918. In his answer he alleged that he had paid the last sickness and burial expenses of the child, but, on the trial. it was admitted that whatever of those expenses he did pay were paid just before this trial in 1925.

We think the foregoing is a fair statement of the material facts proved on the issues joined on the original pleadings.

On cross-examination of the plaintiff it was developed that after the death of her child in 1919, she had earned her living principally by working as waitress at hotels and restaurants, and, in following that occupation, she had been in different towns and cities until the death of her parents in 1924, when she had returned to the home place and kept house for her two brothers on the farm for about six months; that she had been in Houston, Tex., where she had worked as demonstrator for certain grocery firms, and had worked for an amusement company whose business was to advertise and sell tickets for different entertainments.

After the court took the case under advisement March 25th, the defendant sent out detectives, or certain men acting in that capacity, to see what they could learn of the plaintiff's conduct subsequent to their separation, and, on April 7th, filed his motion to reopen the case for newly discovered evidence, as above stated. In opposition to that motion it appears that the plaintiff secured affidavits and took depositions of various people for the purpose of disproving the allegations. It is not made to appear by the record whether the court considered those depositions in passing upon the motion to reopen the case, but they are incorporated in the record and appear to have been used in the defense after defendant had filed the amendment to his cross-petition.

The record discloses that the alleged paramour, E. L. Lash, verified the defendant's amendment to his cross-petition, and voluntarily appeared in court as a witness, without process, and testified that he had had sexual relations with the plaintiff in the winter of 1915-1916, and again in 1924, while she was keeping house on the farm for her brothers. His evidence shows that he lost his parents when small, and after he grew to manhood became a tramp, traveling over the country getting his living the best way he could. He frankly stated that he often begged his living. About the year 1915 he came to Beaver county, and from that time until the time of the trial in 1925, with the exception of about 18 months, when he was in the army during the World War and for a short time in Colorado, he had lived at different places in the community engaged as a farm hand. In some of the depositions witnesses living in that community testified that his reputation for truth and veracity was bad, while others testified that it was good. We think it is not material, as the case must stand or fall on his uncorroborated testimony, voluntarily given for a con-

sideration of his expenses and $10 per day. He testified that he was expecting $10 per day for time expended in addition to his expenses.

The evidence shows that between the time the court took the case under advisement on March 25th, and the time of trial on the issues raised by the amendment, May 22nd, a brother-in-law of the defendant, and probably others, had called upon practically all of the people living in the community of the plaintiff's people in Beaver county, for the ostensible purpose of ascertaining who had written the anonymous letter above referred to, and had made diligent inquiry in that community and in Liberal, Kan., as to the conduct and reputation of the plaintiff. On one occasion defendant's brother-in-law stated that if they did not find the evidence it would cost defendant $8,000 or $10,000.

The witness Lash testified that he had never told any person of having had improper relations with the plaintiff until the direct question was asked him by Charley Alling, defendant's brother-in-law, and that he then told him the truth. He testified that in December of 1915, while plaintiff was visiting her family in Beaver county, she spent part of the time with her sister, Mrs. Vardeman, who resided on a claim with her 12-year old son, a short distance from her father's place; that at that time Mrs. Vardeman invited him to call one evening, and when he arrived the plaintiff was there: that they played cards that evening, but nothing improper occurred; that he was invited to call again, and on the next evening, or an evening later when he called, he found Mrs. Vardeman and the plaintiff and Mr. E. J. Ogen, who was a bachelor residing on an adjoining farm; that Mrs. Vardeman left the place with Mr. Ogen and went to his place, where they stayed all night, and that he and the plaintiff slept together that night and had sexual intercourse, and that a similar transaction occurred regularly for about two weeks thereafter. He also testified that he had had improper relations with the plaintiff in 1924.

Mr. Ogen and Mrs. Vardeman were subsequently married, and both testified that such transaction never occurred. The only attempt at corroboration of the testimony of the witness Lash was by the testimony of Jerry Ellexson, who lived on the adjoining place to Mrs. Vardeman, and for whom the witness Lash was at the time working as a farm hand. He testified with apparent freedom that he remembered the occasion;

that about eight o'clock in the evening Lash would dress up and leave his house going in that direction, and would return late, and, on one occasion. was out all night.

Some credence might be given the testimony of the witness Lash if he had been brought into court by process and had reluctantly told his story, but, in these circumstances, where the testimony was searched for after the defendant had failed to disprove plaintiff's testimony establishing' her right to a divorce. and the alleged paramour, expecting to receive $10 a day for time expended, voluntarily came from another state into this state and verified the amended pleading, and freely and voluntarily testified to having such relations with plaintiff. the only effect of which could be, if believed, to destroy her character and relieve the defendant of paying her alimony, so displays and establishes his own moral depravity to such an extent that his testimony is discredited. insufficient, and unconvincing.

After a diligent search we have been unable to find a single case where the voluntary, uncorroborated testimony of an alleged paramour has been held sufficient to sustain a decree of divorce. An interesting and instructive discussion of such evidence is found in the case of Letts v. Letts, 79 N. J. Eq. Rep. 630. Other cases are: Payne v. Payne, 42 Ark. 235; Delling v. Delling (34 Misc. Rep. 122) 69 N. Y. S. 479; Glasser v. Glasser (35 Misc. Rep. 231) 73 N. Y. S. 284.

The testimony of the witness Lash was not only uncorroborated. but was overcome by rebutting evidence. He testified with circumstantial particularity as to the occasion on which he first had unlawful relations with the plaintiff; that Mrs. Vardeman and Mr. Ogen went to Mr. Ogen's house and left him and the plaintiff alone at night. This is strongly denied by all the parties mentioned by him.

If the court should hold that the uncorroborated testimony of an alleged paramour was sufficient to blacken the character of a woman and entitle the husband to divorce without alimony, as contended in this case, it would open the door to unscrupulous men of wealth to discard and destroy their wives when they willed. It seems inconceivable that any man would stoop so low as to testify falsely to such transactions, but experience teaches that there are such men.

In this state we have a statute which prohibits conviction in a criminal case on the uncorroborated testimony of an accomplice. but we have no such statute applicable to suits for divorce. But, in suits for divorce, before the decree may be granted against the woman on such charges the proof. must be convincing; and, in this case, where the alleged paramour was receiving, or expecting to receive, compensation for time expended far in excess of that which he would receive in his usual occupation of a farm hand. and he has gone to such great lenght to aid in the preparation of the case, and in voluntarily furnishing his testimony, his testimony is not convincing and not sufficient to establish the husband's right to a divorce.

Evidence that the plaintiff was an inmate of a house of prostitution in Houston. Tex., is not convincing and, we think, fairly disproved. A policeman and policewoman were brought from Houston, Tex., to testify in the case. Their evidence was that about eight o'clock one evening they made a raid and found plaintiff to be the only woman in the house. She was standing in the door between the kitchen and another room, which the evidence shows was the sitting room, talking to a man in his shirt sleeves. and another man was sitting at the table in the kitchen. She was taken to the police station and held for the clinic. She passed the clinic. A charge of vagrancy was filed against her, but she was never prosecuted. They testified that the house was located in the Mexican quarter, and had the reputation of being a house of prostitution. They testified that the landlady had gone up town, and she or any other person was not arrested or disturbed. It is not made to appear from the evidence that the house was in fact a house of prostitution, or that the attention of the police department had ever been called to it on any other occasion.

Plaintiff's evidence was that she and another woman, with whom she had been rooming for sometime, secured rooms in this house the day the raid was made, or the day before; that she was paying for the room, but was doing work in the kitchen to pay her board; that she was in the kitchen at the time she was arrested, for the purpose of washing the dishes. She also testified that the man standing in the door in his shirt sleeves was the son of the landlady, about 18 years old. The evidence shows that the house was being run at that time as a boarding house and married people lived there. One of the proprietors of the house testified, at the time

his deposition was taken in 1925, that the community was largely inhabited by Mexicans, but at the time of the raid, two years prior thereto, there were not nearly so many Mexicans in that community.

The depositions of a number of witnesses were taken by plaintiff as to the nature of her employment while in Houston. and as to her conduct and deportment while there. These witnesses were cross-examined, and. from their evidence, it is fairly well estab lished that during the time plaintiff was in Houston she was engaged most of the time in honorable employment. had properly deported herself, and, in the minds of those who had come in contact with her, bore a good reputation.

George E. Gordon, an attorney at law at Houston, who officed next door to the amusement company for which the plaintiff worked, and who rented the office to the amusement company, testified that he knew the plaintiff and·saw her every day except Sundays, and that her reputation was an excellent one during the time he knew her. He testified that he was not the plaintiff's attorney at any time, but that he arranged bond for her when she was arrested; that he and his wife and another attorney and his wife were given to the police department as references as to her good character; that she left the employment of the company when a telegram came saying her mother was not expected to live. The telegram came to his office. He had heard her commended by her employer on a number of occasions.

After carefully reading the evidence, covering more than 900 pages, the only satisfactory conclusion we are able to reach is that the charges made against the plaintiff are not sustained by the evidence and were in fact disproved. The only witness who testified to any specific act on the part of the plaintiff detrimental to her character or reputation was the witness E. L. Lash. His testimony is uncorroborated and wholly discredited by his voluntary appearance and interest shown by him in the case for $10 a day and expenses. The inference may fairly be drawn from his testimony that his expenses had been paid from the time he left Liberal, Kan.. and that he was expecting $10 per day in addition from that time, April 7th to May 22nd, when the case was tried. Concerning this witness we adopt the language of the New Jersey court in Letts v. Letts, supra. in commenting upon a witness whose conduct was less flagrant than that of the witness Lash:

"I doubt if there can be found in the history of the divorce court anywhere such a rara avis, a male corespondent, who had voluntarily come forward in aid of an injured husband suing for a divorce; who had sunk his manhood. his morals and his honor so low as to go voluntarily upon the witness stand and with brazen impunity proclaimed his triumph over his victim, to irretrievably disgrace and ruin her. The experience of mankind has been to the contrary, and, therefore, when a case arises which is contrary to this experience, it is such an aberration from the normal trend of human action that it requires convincing proof to confirm it."

Having concluded that the trial court erred in denying plaintiff's prayer for divorce. and that the decree for the defendant and against the plaintiff is contrary to the clear weight of the evidence, it is unnecessary to consider defendant's contention that, under the statute, alimony may not be awarded the wife where the husband is given the divorce for the fault of the wife.

Prior to the time the parties separated in October. 1918, the defendant had inherited from his father a one-sixth interest in a farm. of no great value, in Noble county. In 1922 oil was discovered on the land, and since that discovery the defendant has received in royalties in excess of $33 000.

The trial court, in addition to $1,000 paid by the defendant as attorney's fee, awarded the plaintiff $250 as attorney's fees. which we think reasonable in view of the services rendered. The trial court was of the opinion, and so decreed, that as a division of the property jointly acquired before their separation. and as alimony, the defendant should pay plaintiff $7,500, although defendant was decreed an absolute divorce from the plaintiff.

The judgment is. therefore, reversed as to the divorce decree, and the cause remanded, with directions to set aside and vacate the judgment granting the defendant a divorce. and enter a judgment and decree, in form required by law, in favor of plaintiff and against defendant for an absolute divorce. In all other respects, the judgment is affirmed.

By the Court: It is so ordered.

Note.—See under (1) 19 C. J. p. 137, §355; p. 141, §364; 9 R. C. L. p. 332; 2 R. C. L. Supp. p. 782. (2) 19 C. J. p. 56, §108; p. 144, §368; p. 242, §566; p. 253, §588; p. 257, §596; p. 264, §612.